UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |
|---|---|
| CONTINENTAL CASUALTY COMPANY, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) Case No. _____ <br> ) |
| CANTOR COLBURN, LLP; GS CLEANTECH CORPORATION; GREENSHIFT CORPORATION | ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Continental Casualty Company ("Continental"), for its Complaint for Declaratory Judgment, alleges on knowledge, information, and belief as follows:

**NATURE OF THE ACTION**

1. Continental files this action to obtain a judicial determination and declaration of the parties' respective rights and obligations under Lawyers Professional Liability Policy No. 198279108, which Continental issued to Cantor Colburn, LLP (the "Firm") for the **policy period** of October 30, 2015 to October 30, 2016 (the "Policy").[1] A true and correct copy of the Policy (except for the application) is attached hereto as Exhibit A.

2. An actual and justiciable controversy has arisen and now exists relating to the parties' respective rights, duties, and obligations under the Policy.

3. In particular, Continental seeks a judicial declaration that the Policy does not provide coverage for a May 3, 2023 arbitration demand filed by Greenshift Corporation and GS

---

[1] Terms in bold are defined in the Policy and carry the same meaning here.

CleanTech Corporation ("CleanTech") against the Firm (the "CleanTech Claim") because the CleanTech Claim arises from intentional wrongdoing by the Firm and its client, as determined by the findings of this Court, as affirmed by the United States Court of Appeals for the Federal Circuit.

4. The Firm tendered the CleanTech Claim to Continental for coverage under the Policy. To protect the interests of the insureds while the coverage issues remain undecided, Continental consented to the appointment of independent counsel to represent the Insureds' interests and is providing the Firm with a defense subject to a full and complete reservation of rights, including but not limited to the right to withdraw from that defense and to seek reimbursement of all amounts paid by Continental. Continental seeks declaratory relief and a money judgment in this action for reimbursement of those defense costs.

## PARTIES

5. Plaintiff Continental is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business located in Chicago, Illinois. Continental legally transacts insurance business in Indiana and within the geographical jurisdiction of this Court.

6. Defendant Cantor Colburn, LLP is a limited liability partnership with its principal place of business at 20 Church Street, Hartford, Connecticut. The Firm is a citizen of Connecticut, Georgia, Michigan, Virginia, and Texas because its partners are citizens of those states. The Firm is the **Named Insured** under the Policy. Peter R. Hagerty ("Hagerty"), Charles F. O'Brien ("O'Brien"), and Michael Rye ("Rye") are partners of the Firm and, although referenced in the CleanTech Claim, they are not named as Respondents in the CleanTech Claim nor as Defendants in this action.

7.	GS CleanTech Corporation is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Oklahoma.  So, GS CleanTech Corporation is a citizen of the states of Delaware and Oklahoma.  It is named as a defendant to the extent it claims any rights under the Policy.  Continental is willing to dismiss GS CleanTech Corporation from this litigation if it agrees to be bound by the outcome of this action.

8.	Greenshift Corporation is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Oklahoma.  So, Greenshift Corporation is a citizen of the states of Delaware and Oklahoma.  It is named as a defendant to the extent it claims any rights under the Policy.  Continental is willing to dismiss Greenshift Corporation from this litigation if it agrees to be bound by the outcome of this action.

## JURISDICTION AND VENUE

9.	This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, for the purposes of determining a question of actual controversy between the parties as described more fully below.  Continental also seeks a money judgment.

10.	This action currently is ripe for adjudication.

11.	This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.	Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  A substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL ALLEGATIONS

### The Policy

13. The Policy includes a Quota Share Endorsement and is underwritten by Continental and Axis Insurance ("Axis"). It includes a $15 million each **claim** limit of liability and a $30 million aggregate limit of liability, inclusive of **claim expenses**. *See* Exhibit A, Policy, Endorsement No. 9.

14. Per the Quota Share, Continental's and Axis's liability under the Policy is several, not joint, and Continental and Axis are responsible for $10 million and $5 million, respectively, of the each **claim** Policy limit. *See id.*

15. The Policy also includes an each **claim** deductible of $75,000 and an aggregate deductible of $200,000. *See id.*

16. The Policy's Insuring Agreement states:

> The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable.

*See* Exhibit A, Section I.A.

17. The **Company** is Continental. *See* Exhibit A, Section III.

18. The Policy defines **Insured** as the **Named Insured** and "any lawyer (including a government affairs advisor or lobbyist), partnership, professional corporation, professional association, limited liability company or limited liability partnership who is or becomes a partner, officer, director, stockholder-employee, associate, manager, member or **employee** of the **Named Insured** during the **policy period** shown in the Declarations." *See id.*

4

19. **Claim** is defined as "a demand, including the service of suit or the institution of any alternative dispute resolution proceeding, received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failure to render **legal services**." *See id.*

20. Section II.D of the Policy provides, "If **related claims** are subsequently made against the **Insured** and reported to the **Company**, all such **related claims**, whenever made, shall be considered a single **claim** first made and reported to the **Company** within the **policy period** in which the earliest of the **related claims** was first made and reported to the **Company**."

21. **Related claims** mean "all **claims** arising out of a single act or omission or arising out of **related acts or omissions** in the rendering of **legal services**." *See* Policy, Section III. **Related acts or omissions** are "all acts or omissions in the rendering of **legal services** that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." *See id.*

22. **Legal services** mean "those services, including eleemosynary (pro bono) services, performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or other neutral fact finder or as a notary public. Any title agency or company, on whose behalf the **Insured** acts as title agent or designated issuing attorney, is not an **Insured** under this Policy." *See id.*

23. The Policy defines **claim expenses** as "fees charged by attorneys designated by the **Company** or by the **Insured** with the **Company's** written consent" and "all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **claim** if incurred by the **Company**, or by the **Insured** with the written consent of the **Company**." *See id.*

24. The Policy states that Continental "shall have the right and duty to defend in the **Insured's** name and on the **Insured's** behalf, a **claim** covered by this Policy, even if any of the allegations of the **claim** are groundless, false, or fraudulent." *See id.*, Section I.B., as amended by Endorsement No. 5.

25. The Policy provides that it does not apply

> to any **claim** based on or arising out of any dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by an **Insured** except that:
>
> 1. this exclusion shall not apply to **personal injury;**
>
> 2. the **Company** shall provide the **Insured** with a defense of such **claim** unless or until the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Company's** rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against any **Insured;**
>
> 3. this exclusion will not apply to any **Insured** who is not found to have personally committed the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by any trial verdict, court ruling, or regulatory ruling.

*See id.*, Section IV.A (the "Intentional Acts Exclusion").

**The Firm's Representation of CleanTech**

26. In March 2008, CleanTech retained Hagerty and the Firm to represent it before the United States Patent and Trademark Office ("PTO") in connection with the prosecution of several patents related to a method of separating corn oil from heated thin stillage (a byproduct of ethanol production) using a centrifuge. The Firm took over the prosecution of the patents from CleanTech's previous counsel, who submitted the first patent application to the PTO on August 17, 2004 and worked on CleanTech's behalf thereafter.

27. In September 2009, CleanTech retained Rye, O'Brien and the Firm also to act as litigation counsel to pursue numerous patent infringement lawsuits concerning the potential patent for the corn oil separation method.

28. On October 13, 2009, the PTO allowed a patent for the corn oil separation method and, thereafter, the Firm continued to prosecute related patents for CleanTech.

29. Beginning in February 2010, the Firm filed over ten patent infringement lawsuits on behalf of CleanTech against various defendants. These lawsuits were consolidated into multi-district litigation in the United States District Court for the Southern District of Indiana, No. 1:10-cv-00180-LJM-DML (the "MDL Litigation"). The Firm also represented CleanTech in a separate, but related, patent infringement lawsuit filed against Adkins Energy, LLC in the United States District Court for Northern District of Illinois, captioned, *GS CleanTech Corporation v. Adkins Energy LLC*, No. 1:10-cv-4391 (N.D. Ill.) (the "Adkins Litigation").

**The Court Finds Intentional Wrongdoing by the Firm**

30. On September 15, 2016, following a nine-day bench trial in early October 2015, the Court in the MDL Litigation issued a 78-page opinion finding "inequitable conduct before the PTO" by CleanTech *and* the Firm, since they "intentionally withheld material from the PTO." A true and correct copy of the September 15, 2016 Corrected Memorandum Opinion and Order is attached as Exhibit B.

31. The Court determined that, in or around March 24, 2010, the Firm learned of a July 31, 2003, offer by CleanTech to sell the corn oil separation method to Agri-Energy, which was more than a year before the initial patent application was filed. Exhibit B at 31-32.

7

32. After receiving these 2003 documents in 2010, the Firm investigated CleanTech's interactions with Agri-Energy to assess the potential applicability of the on-sale bar. Exhibit B at 33-39.

33. In November 2010, the Firm drafted a declaration to be submitted to the PTO by CleanTech concerning CleanTech's 2003 interactions with Agri-Energy. This first declaration stated that the signed July 31, 2003, letter from CleanTech was <u>first delivered</u> to Agri-Tech representatives on August 18, 2003, which was one day after the on-sale bar date of August 17, 2003 ("the First Declaration"). The Firm filed the First Declaration with the PTO on November 9, 2010. Exhibit B at 40-42.

34. On September 21, 2011, defendants in the MDL Litigation deposed the CleanTech inventor who signed the First Declaration. Exhibit B at 43. During that deposition, the MDL Defendants confronted the inventor with an August 1, 2003, e-mail to Agri-Tech enclosing an unsigned version of the July 31, 2003, letter. The Court concluded that, based on this testimony, the August 18, 2003, statement in the First Declaration was "false." Exhibit B at 41.

35. Hagerty, the Firm attorney responsible for the patent prosecution, testified that "it sent a chill up his spine" when he learned that the letter had been sent on August 1, 2003. Exhibit B at 43. The Court stated that the only plausible reason for Hagerty to be "concerned at all is because the story he presented to the PTO was false." Exhibit B at 44.

36. The Court found that the Firm failed to contact the inventor for seven months after his deposition testimony and never contacted Agri-Energy from September 2011 to April 2012, to investigate the authenticity of the August 1, 2003 e-mail. Exhibit B at 44-45.

37. The Court stated, "Most disturbing is that, during this period [September 2011 to April 2012], neither litigation counsel [at the Firm or Hagerty] did anything to alert the PTO that [First Declaration] was false . . . ." Exhibit B at 45. In addition, the Firm filed a response to an office action from the PTO and failed to include any information to correct the First Declaration. Exhibit B at 45.

38. In July 2012, CleanTech's inventor executed a second declaration that the Firm prepared regarding the August 1, 2013, e-mail, which was submitted to the PTO along with several redacted filings from the MDL Litigation (the "Second Declaration"). The Court held that the Second Declaration "fails to distinctly point out and/or explain the false information previously provided to the examiner in [the First Declaration]. In addition, the [Second Declaration] creates the false impressions [the inventor] may not have sent the August 1, 2003, e-mail and that the unsigned letter has less significance than the 'signed' one he allegedly hand delivered the same month." Exhibit B at 48.

39. Based on these findings, the Court considered "both the failure to explain the significance of the documents and the failure to provide the PTO with an un-redacted version of the filed papers or the underlying documents themselves strong evidence of an intent to deceive." Exhibit B at 50.

40. The Court also analyzed multiple patents obtained by the Firm for CleanTech "to determine whether material documents were intentionally excluded when they should have been submitted." Exhibit B at 65.

41. The Court made the following findings concerning the Firm's intentional deceit of the PTO:

- "The Court can only conclude that [the inventors] intentionally allowed [Hagerty] to create this false impression and that [Hagerty], knowing and relying on facts to the contrary, purposefully withheld the results in 2003 in favor of the new story" that "created a false impression that the first time information existed to confirm the method was May 2004." Exhibit B at 68.

- "In prosecution of the '516 and '517 patents, the inventors and attorneys misrepresented to the PTO that the July 31 [2003] offer letter was immaterial by filing the false [First Declaration] and by leaving un-rebutted the irrelevant 2004 feasibility testing letter." Exhibit B at 72.

- "On September 21, 2011, Defendants deposed [one of the inventors] and the August 1, 2003, email with the July 31 [2003] Proposal attachment was disclosed. At this point, the inventors and Cantor Colburn know for certain that [the First Declaration] is false. The Court finds strong evidence of intentional deceit in the ensuing delay by Cantor Colburn in investigating the facts . . . ." Exhibit B at 74.

42. The Court held, "For those reasons, as well as the reasons outlined here, the Court concludes that the inventors and the attorneys *intentionally* withheld material information from the PTO during prosecution of the '484 patent." Exhibit B at 77 (emphasis added).

43. On March 20, 2020, the United States Court of Appeals for the Federal Circuit affirmed the trial court's inequitable conduct ruling and held that the court did not abuse its discretion in finding that CleanTech and Cantor Colburn intended to deceive the PTO. A true and correct copy of the opinion is attached as Exhibit C.

44. The Federal Circuit held, "Based on this evidence, we conclude that the District Court did not abuse its discretion in concluding that, by clear and convincing evidence, the single most reasonable inference to be drawn from the record was that the Inventors and Cantor Colburn intended to deceive the USPTO." Exhibit C at 37.

**The Patent Defendants' Claim**

45. On March 22, 2016, Adkins Energy sought sanctions against CleanTech under 35 U.S.C. § 285 and against the Firm, including its attorneys of record, under 28 U.S.C. § 1927 for litigation misconduct (the "Adkins Motion").

46. On September 26, 2016, following the Court's Inequitable Conduct ruling, the MDL Defendants expressed their intent to seek attorneys' fees, expert fees, expenses, and costs as sanctions against the Firm, pursuant to F.R.C.P. 11, 35 U.S.C. § 285, and 28 U.S.C. §1927 (together, with the Adkins Motion, the "Patent Defendants' Claim").

**The Firm's Tender of the Patent Defendants' Claim**

47. On September 30, 2016, the Firm *for the first time* provided Continental via e-mail with notice of a "new potential matter," forwarding an October 23, 2014, Summary Judgment decision (almost two years after it had been issued), the September 15, 2016, Inequitable Conduct ruling, and the CleanTech Claim, and seeking coverage under the Policy.

48. On December 6, 2016, Continental issued a letter to the **Insureds** setting forth its position with respect to coverage, agreeing to accept the defense of the CleanTech Claim subject to a reservation of rights and also agreeing to the **Insureds'** retention of independent counsel of its choice to represent the Firm against the CleanTech Claim.

49. During the pendency of the Patent Defendants' Claim, on May 9, 2017, Continental filed a declaratory judgment action against the Firm and several Firm attorneys in

11

this Court, No. 1:17-cv-01523-RLM-DML (the "Declaratory Judgment Action").  Continental argued that no coverage was available under the Policy for the Patent Defendants' Claim because the **Claim** arises from intentional wrongdoing by the Insureds, among other reasons.

50. The Firm and the Patent Defendants resolved the Patent Defendants' Claim on confidential terms.

51. Continental and the Firm confidentially resolved the dispute between them regarding the availability of coverage under the Policy for the Patent Defendants' Claim and dismissed the Declaratory Judgment Action without prejudice.

**The CleanTech Claim**

52. On April 25, 2017, CleanTech verbally threatened to bring a malpractice action against the Insureds.  The threatened malpractice action related to the prosecution of various patents for CleanTech and for the management of the Patent Infringement Litigation.

53. On July 26, 2017, CleanTech made a written demand on the Firm regarding alleged legal malpractice.  Specifically, CleanTech alleged that "Cantor's acts and omissions include, but are not limited to, the acts and omissions set forth in the Corrected Memorandum and Order after Bench Trial dated September 1, 2016 in the Patent Litigation."  CleanTech alleged that it had "suffered, and will continue to suffer, monetary damages as a result of Cantor's acts and omissions constituting legal malpractice.  These monetary damages include, but are not limited to, loss of revenue, attorneys' fees paid to Cantor and other law firms, and the potential award of attorneys' fees resulting from the Court's finding of inequitable conduct in the Patent Litigation.  CleanTech and Greenshift hereby demand payment for these amounts."

54. On April 20, 2021, CleanTech filed an arbitration demand against the Firm arising from the intentional wrongdoing determined by this Court in the inequitable conduct ruling, as affirmed on appeal.

55. On May 3, 2023, CleanTech filed an Amended Statement of Claim, which also arises from the intentional wrongdoing determined by this Court in the inequitable conduct ruling, as affirmed on appeal.

56. The CleanTech Claim and the Patent Defendants' Claim constitute **related claim**s because they arise out of acts or omissions in the rendering of **legal services** that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision—namely, the Insureds' representation of CleanTech in the prosecution of various patents and the Insureds' conduct in the representation of CleanTech in the Patent Infringement Litigation.

57. Thus, the CleanTech Claim is a **claim** first made during the **policy period** of the Policy and a single **claim** with the Patent Defendants' Claim.

## COUNT I

**For a Declaration that There Is No Coverage for the CleanTech Claim Based on the Intentional Acts Exclusion**

58. Continental re-alleges and incorporates by reference Paragraphs 1-57 of this Complaint as if fully set forth herein.

59. The Intentional Acts Exclusion provides that the Policy does not apply:

> to any **claim** based on or arising out of any dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by an **Insured** except that:
>
> 1. this exclusion shall not apply to **personal injury**;

13

    2.    the **Company** shall provide the **Insured** with a defense of such **claim** unless or until the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not.  Such defense will not waive any of the **Company's** rights under this Policy.  Criminal proceedings are not covered under this Policy regardless of the allegations made against any **Insured**;

    3.    this exclusion will not apply to any **Insured** who is not found to have personally committed the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by any trial verdict, court ruling, or regulatory ruling.

*See* Exhibit A, Section IV.A.

60. The CleanTech Claim is based on or arises out of intentional wrongdoing by an **Insured**.

61. The **Insureds** intentional wrongdoing has been determined by a court ruling: the September 15, 2016 Corrected Memorandum of Opinion and Order After Bench Trial and as affirmed by the United States Court of Appeals for the Federal Circuit.

62. The Intentional Acts Exclusion applies to the Firm.

63. Therefore, Continental is entitled to a judgment declaring that the Policy provides no coverage to the **Insureds** for the CleanTech Claim and that Continental has no duty to defend or indemnify the **Insureds** with respect to the CleanTech Claim.

## COUNT II

**For Declaratory Relief and Money Judgment For Reimbursement Of Amounts Paid to Defend the CleanTech Claim**

64. Continental re-alleges and incorporates by reference Paragraphs 1-57 of this Complaint as if fully set forth herein.

65. Continental agreed to pay defense fees and costs incurred by the Firm in the CleanTech Claim, subject to a reservation of the right to seek repayment.

66. Amounts paid by Continental in connection with the CleanTech Claim constitute unjust enrichment to which defendant insureds are not entitled.

67. Because the Policy does not afford coverage for the CleanTech Claim, and under applicable law, Continental is entitled to recoup amounts it has paid or pays hereafter under the Policy in connection with the CleanTech Claim.

68. Accordingly, Continental requests a declaration that the Firm is obligated to reimburse Continental for amounts it has paid on behalf of the Firm in connection with the CleanTech Claim and a money judgment against the Firm in that amount.

WHEREFORE, Continental respectfully requests that this Court:

A. Enter judgment that the Policy does not provide coverage for the CleanTech Claim because the Intentional Acts Exclusion bars coverage for claims arising out of the insureds' intentional wrongdoing, and that Continental therefore owes no duty to defend or indemnify the Firm against the CleanTech Claim;

B. Enter judgment that Continental is entitled to reimbursement of any amounts paid by Continental in the defense of the CleanTech Claim to the extent allowed by law and a money judgment against the Firm for that amount;

C. Award Continental its costs incurred herein and; and

D. Award Continental all other relief to which it may be entitled.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | By: /s/ Leland H. Jones IV |
| Dated: June 23, 2023 | Richard A. Simpson<br>Leland H. Jones IV<br>Wiley Rein LLP<br>2050 M Street, NW<br>Washington, DC 20036<br>202.719.7178<br>rsimpson@wiley.law<br>ljones@wiley.law<br><br>*Attorneys for Plaintiff Continental Casualty Company* |